UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                                                     Case No. 20-cr-206-pp

FRANWAN MATHIS,

        Defendant.

**ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS EVIDENCE (DKT. NO. 47)**

On November 3, 2020, the grand jury returned a three-count indictment charging Franwan Mathis with one count of knowingly possessing a firearm after having been convicted of a crime punishable by a term exceeding one year in prison; one count of possessing with intent to distribute methamphetamine, heroin, crack and fentanyl; and one count of knowingly possessing a firearm in furtherance of the drug trafficking offense charged in the second count. Dkt. No. 2. At the time he allegedly committed these offenses—October 27, 2020—the defendant was serving a term of supervised release imposed following his felony conviction for conspiracy to possess with intent to distribute cocaine, crack and marijuana in <u>United States v. Mathis</u>, Case No. 09-cr-254 (E.D. Wis.). Dkt. No. 3 at 3.

The revocation report in the 2009 case indicates that on October 27, 2020, when the U.S. Marshals Service arrested him on alleged supervised release violations, the defendant had in his waistband a Diamondback Firearm

1

9mm pistol loaded with fifteen rounds, thirty small baggies of suspected crack, seven small baggies of suspected heroin, one small baggie of suspected fentanyl, six small baggies of suspected amphetamines and fifty-five amphetamine pills/tablets. United States v. Franwan Mathis, Case No. 09-cr-254, Dkt. No. 1041 at 1-2.

The defendant has filed a *pro se* motion to suppress. Dkt. No. 47. In its response to the defendant's motion to suppress, the government indicates that the Marshals Service arrested the defendant at a gas station in Milwaukee. Dkt. No. 50 at 1. It indicates that the officers found the alleged controlled substances in the defendant's pockets and that he was the only person in the vehicle when he was arrested. Id. at 1-2.

The minute entry from the defendant's arraignment and plea hearing in this case indicates that existing discovery materials were available as of December 7, 2020.[1] Dkt. No. 6 at 1. That same day, the magistrate judge issued an order requiring that pretrial motions must be filed by December 22, 2020. Dkt. No. 7.

On April 9, 2021, the court received a letter from the defendant, asserting that he believed the International System of Units was a critical issue

---

[1] It appears that in December 2020, the government had not yet had the substances seized from the defendant formally analyzed by the DEA lab. This would not be unusual—it is costly and takes time to have a lab analyze controlled substances. If a defendant is not arguing that the substance he possessed was an illegal controlled substance—for example, if his defense is that the substances *were* controlled substances but that they were not his or that he did not know they were there or that they were for his personal use—there is no reason for the government to have the substances analyzed by the lab.

2

in the case. Dkt. No. 22. At a hearing on April 20, 2021—with no briefing—the court opined that the 2019 redefinition of the International System of Units had not changed how drug weight was calculated for the purpose of drug offenses; the defendant disagreed. Dkt. No. 24 at 1. Nonetheless, on September 28, 2021, the court issued an order allowing the defendant to file pretrial motions himself, acting on his own behalf, even though he had an experienced lawyer representing him and despite the fact that the deadline for filing pretrial motions had passed over nine months earlier. Dkt. No. 43.

The defendant timely filed his *pro se* motion, dkt. no. 47, and the government responded, dkt. no. 50. The defendant also has filed a letter. Dkt. No. 51. The case is scheduled for a jury trial starting November 8, 2021 at 8:30 a.m.

The defendant asks the court to "suppress all materials not presented to defendant in this case, also suspected marijuana, 3 grams/suspected herion, 3 grams suspected amphetamizes 6 grams/suspected amphetamizes 55 tablets/pills/suspected cocaine base, 3 grams and suspected cocaine base 5 grams." Dkt. No. 47 at 8. In support of this request, the defendant asserts that the government has not turned over to him "laboratory test of drugs placed in inventory, field-test of drugs including certificate of analysis, scale instrument (device) certificate and scale instrument (device) certified report." Id. at 1. The defendant makes several arguments related to the fact that he has not received these items. First, he argues that "[b]ased on the statutory penalties in Section 21 U.S.C. § 841(a)(1) the district court could consider only the drug quantity

3

that a jury finds beyond a reasonable doubt based on Alleyne v. United States."[2] Id. at 2. Second, he argues that the government has violated his due process rights by failing to provide the information, citing Mooney v. Holohan, 294 U.S. 103 (1935), id., and Brady v. Maryland,[3] id. at 7. Third, he argues that 21 U.S.C. §841(a)(1) requires that his sentence be determined by drug quantity. Id. at 3.

Related to all three of these arguments, the defendant explains that the metric system—defined by the National Institute of Standards and Technology—governs the definition of weight. Id. at 4. He asserts—without citation to any authority[4]—that "[t]o trigger the presumption of admissibility, the government must establish that it substantially complied with the test using scale instrument traceable to NIST standards." Id. at 5. As best the court can determine, the defendant argues that because the government has not provided him with lab reports, field tests or scale instrument certificates, he cannot tell whether the government complied with NIST standards in analyzing and weighing the alleged controlled substances. He implies that he cannot tell whether the evidence of the alleged controlled substances is admissible at trial

---

[2] Alleyne v. United States, 570 U.S. 99 (2013).

[3] Brady v. Maryland, 373 U.S. 83 (1963).

[4] The defendant seems to be quoting from a case or some other source here; at one point, he says, "As instructed in Burnside, we are looking at the contents of the regulation to see if the government has demonstrated that it substantially complied with the requirements of the regulation when it administered the weighing of the drugs." Dkt. No. 47 at 5. He does not identify the case or other document from which he cited this sentence, however, and gives no citation to "Burnside," if that is a case name.

4

or what amounts will be attributable to him at sentencing. And more broadly, he argues that the government has deprived him of due process by failing to provide him with this information.

On October 29, 2021, the court receive a letter from the defendant in which he indicated that his lawyer had sent him a thumb drive containing the discovery, but that it had been "damaged in the process of mail delivery." Dkt. No. 51 at 1. He attached to his letter an October 13, 2021 incident report from an officer Duckett, indicating that on October 8, 2021, the jail had received an envelope from defense counsel, indicating that it had a thumb drive with discovery for the defendant, but that there was a small tear on the side of the envelope and "it was apparent that there was no thumb drive inside the envelope." Dkt. No. 51-1. Officer Duckett indicated that he had advised defense counsel of this fact and that defense counsel had stated he would drop off a replacement. Id.

The government responded that on September 14, 2021, staff at the North Central Laboratory of the Drug Enforcement Administration completed their analysis of the substances the Marshals Service had found on the defendant's person on October 27, 2020. Dkt. No. 50 at 3. The government states that the next day—September 15, 2021—the lab reports reflecting these analyses were produced to defense counsel. Id. The government notes that the pretrial report filed on September 2, 2021 identifies the two DEA forensic chemists who will testify at trial about how they tested and weighed the

5

Case 2:20-cr-00206-PP   Filed 11/01/21   Page 5 of 18   Document 52

substances. Id. (citing Dkt. No. 36 at 4, identifying forensic chemist Louis Chavez and senior forensic chemist Junxin Chen).

As to the defendant's arguments about the National Institute of Standards and Technology, the government argues that because the defendant has not been charged with violating any drug statute that carries with it a mandatory minimum penalty based on the amount of the controlled substance, the jury won't be required to decide how much of any controlled substance he possessed. Id. at 3-4. The government concedes that there will be testimony at trial from a law enforcement agency who will explain that the amounts of drugs found on the defendant are consistent with the amounts a person would sell or give others, not amounts one would personally use. Id. at 4. But the government notes that that testimony is not based on the scientific accuracy of the weights of the drugs. Id. The government also says that the DEA staff who tested the drugs will testify at trial, so the defendant will be able to cross-examine them about how they tested and weighed the drugs; the government says that the defendant's attorney is "welcome to inspect the controlled substances at issue prior to the trial." Id.

Finally, while the defendant did not mention the Fourth Amendment in his motion, the government argues that all the evidence he seeks to suppress was seized during a search incident to a valid arrest supported by a warrant. Id.

The defendant first argues that the government has violated his right to due process because it has not provided him with lab reports. He is correct

6

Case 2:20-cr-00206-PP   Filed 11/01/21   Page 6 of 18   Document 52

that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). Whether a substance truly is a controlled substance the possession and distribution of which are prohibited by federal law, and the amount of that substance for sentencing purposes, are material to either guilt or punishment. So if the government *had* withheld lab reports, that would have been a violation of due process.

But the government asserts that it provided the lab reports to defense counsel on September 15, 2021. It sounds as if defense counsel tried to provide some discovery—perhaps including the lab reports—to the defendant by sending him a thumb drive to the jail, but when the envelope arrived on October 8, 2021 (a month in advance of the scheduled November 8, 2021 trial), the envelope was torn and the thumb drive was gone. The government's obligation is to turn over the evidence to the defendant's representative. The government has met that obligation. The fact that the defendant has not yet received the evidence from his lawyer is not a due process violation on the government's part. It appears to be a practical problem with the mail. If the defendant needs more time to get the lab reports from his lawyer and review them, he may seek an adjournment of the November 8, 2021 trial. (The court is not agreeing that it will grant that adjournment; it would need input from defense counsel and the government before making such a decision.)

The government is correct that at the defendant's trial, the jury will not be asked to determine the *amount* of each of the alleged controlled substances. Section 841(a)(1) simply prohibits any person from knowingly or intentionally possessing with the intent to distribute a controlled substance, as defined by 21 U.S.C. §802(6). The Seventh Circuit Pattern Jury Instruction for 21 U.S.C. §841(a)(1) tells the jury that the government must prove, beyond a reasonable doubt, that

> 1. The defendant knowingly possessed [identify the controlled substance alleged in the charge]; and
>
> 2. The defendant intended to distribute the substance to another person; and
>
> 3. The defendant knew the substance [was; contained] some kind of controlled substance. The government is not required to prove that the defendant knew the substance was [identify the controlled substance alleged in the charge.]

The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit (2020 Ed.), p. 883 (available at https://www.ca7.uscourts.gov/pattern-jury-instructions/pattern_criminal_jury_instructions_2020edition.pdf). The instruction does not require the jury to determine the weight of the controlled substance, only that the defendant knowingly possessed it, intended to distribute it and knew that what he had was a controlled substance.

Of course, the jury must find beyond a reasonable doubt that the substances the defendant had in his pockets on October 27, 2020 were "controlled substances" whose possession was unlawful. Section 812 of the Controlled Substances Act (Title 21) lists the five schedules of controlled substances. Section 812(c), Schedule I(b)(10) lists heroin as a Schedule I

controlled substance. Section 812(c), Schedule II(a)(4) lists cocaine and its derivatives as a Schedule II controlled substance. Section 812(c), Schedule II(b)(6) lists fentanyl as a Schedule II controlled substance. Finally, §812(c), Schedule III(a)(1) lists amphetamines as Schedule III controlled substances and Schedule III(a)(3) lists methamphetamine as a Schedule III controlled substance.

At trial, the government must prove to the jury beyond a reasonable doubt that the substances the defendant had in his pockets were heroin, cocaine base, fentanyl and methamphetamine. The government has indicated that it will do that through the two forensic chemists who will testify at trial. (The government also has listed the lab reports as exhibits in its exhibit list. Dkt. No. 36-8, listing Exhibits 4A, lab report regarding cocaine base; 5A, lab report regarding methamphetamine; 6A, lab report regarding opiates.) And as of September 2, 2021, the parties had stipulated—agreed—that the crack, methamphetamine, heroin and fentanyl retrieved from the defendant's pockets were, in fact, controlled substances admissible at trial. Dkt. No. 36-1 at 2.

As the government implies, there are some drug statutes that require a court to impose a mandatory minimum sentence of a defendant is convicted of possessing a certain threshold amount of a controlled substance. Section 841(b)(1)(B)(iii), for example, requires a court to impose a mandatory minimum sentence of five years in prison if the defendant is convicted of possessing twenty-eight grams or more of cocaine base. When the government charges a defendant with possessing an amount of a controlled substance that triggers

such a mandatory minimum sentence, the jury must find beyond a reasonable doubt that the defendant possessed at least that amount. Alleyne v. United States, 570 U.S. 99, 103 (2013) ("Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury.") But the government has not charged the defendant with possessing the amount of any of the controlled substances listed in the indictment that would trigger a mandatory minimum penalty. So again—the government will not be required to prove the amount of each of the controlled substances at trial, nor will the jury be required to make a finding about how much of each controlled substance the defendant possessed.

The government *has* charged the defendant with a crime that carries a mandatory minimum penalty. Count Three of the indictment alleges that the defendant knowingly possessed the 9mm handgun in furtherance of the drug trafficking offense charged in the indictment, in violation of 18 U.S.C. §924(c). Dkt. No. 1 at 3. If the jury convicts the defendant of that charge, §924(c)(1)(A)(i) requires the court to sentence him to mandatory minimum sentence of five (5) years in custody consecutive to any other sentence the court may impose. But it is not the amount of drugs that triggers the mandatory minimum sentence under §924(c). For the jury to find the defendant guilty of §924(c) (subjecting the defendant to the five-year mandatory minimum), it must find beyond a reasonable doubt that the defendant committed the drug trafficking offense in Count Two (possession of heroin, cocaine base, fentanyl and

methamphetamine with intent to distribute), that he possessed the 9mm handgun knowingly and that he possessed it in furtherance of the drug trafficking offense in Count Two. The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit (2020 Ed.), p. 319 (available at https://www.ca7.uscourts.gov/pattern-jury-instructions/pattern_criminal_jury_instructions_2020edition.pdf). "A person possesses a firearm 'in furtherance of' [] a crime if the firearm furthers, advances, moves forward, promotes or facilitates the crime." Id. at p. 328. The weight of the drugs is relevant only to the question of whether the defendant possessed more drugs than a user would possess.

In sum, the government will not be required to prove, nor the jury to find, the weight of the drugs the defendant allegedly possessed—only that he possessed more than a single person would have for personal use.

That takes the court to the defendant's arguments about NIST and ISU. The National Institute of Standards and Technology is part of the United States Department of Commerce. https://www.nist.gov/. Its web site indicates that its "portfolio of services for measurements, standards, and legal metrology provide solutions that ensure measurement traceability, enable quality assurance, and harmonize documentary standards and regulatory practices." Id. "Metrology is the science of measurement and its application." https://www.nist.gov/metrology. "A key component of NIST's metrology work is metrological traceability, which requires the establishment of an unbroken chain of calibrations to specified reference measurement standards: typically

11

national or international standards, in particular realizations of the measurement units of the International System of Units." Id.

The "International System of Units" is commonly known as the metric system. https://www.nist.gov/pml/weights-and-measures/metric-si/si-units. It provides standard measures for length (meters), time (seconds), amounts of substances (moles), electric current (amperes), temperature (kelvin), luminous intensity, or brightness of light (candela) and mass (kilogram). Id. The metric system was revised effective May 20, 2019 to ensure that all the measures in the metric system were based on "unchanging fundamental properties of nature." https://www.nist.gov/si-redefinition/turning-point-humanity-redefining-worlds-measurement-system. Before this revision, measurement units had been embodied in physical objects that could wear out or change and that were not accessible to the general public. The revision based measurements in "constants" of physical science, like the speed of light or $E=mc^2$. Id. The revisions made it possible "to do more accurate and precise measurement science anywhere in the world (and even the universe), without needing calibration to a specific artifact." Id. As the NIST colorfully explained, "With this system, should E.T.[5] or Alf[6] come knocking, we would be able to

---

[5] "E.T." was the main character the 1982 Steven Spielberg film of the same name about an extra-terrestrial (non-earth dweller) who got stranded on earth and made friends with a boy named Elliott, who helped E.T. find the way back to his home planet.

[6] "Alf" was an NBC television comedy that aired between 1986 and 1990; the title character was ALF (an acronym for "**a**lien **l**ife **f**orm") came from another planet and crashed at the home of a middle-class family who took him in, with humorous results.

12

communicate the base units to residents of other planets in other galaxies, who could use them with the same accuracy as we do." Id.

While NIST describes the revision as history-making, it explains that

> [t]he immediate effect of this change will not be noticed by consumers in the marketplace. A kilogram of sliced turkey at the deli counter will still be the same amount of turkey as far as your grocery scale is concerned.
>
> The biggest expected change will likely be for manufacturers of scientific instruments, some of whom may need to adapt their products in coming years to accommodate the revised SI method for better determining measures of electric quantities such as the ampere, the volt and the ohm.
>
> Another key benefit of the redefined SI is improved scalability for measurements. When you use physical objects to measure things, accuracy decreases at sizes much smaller or larger than your standard. A pharmaceutical company, for example, may need to measure chemicals for research on new drugs in quantities that are a million times smaller than a standard kilogram. The new definition of the kilogram will allow much better measurements of these milligram and microgram masses.

Id.

In April of this year, when the defendant first raised the issue of measurements in his letter to the court (and in the subsequent hearing), the defendant appeared to be arguing that the 2019 revision to the metric system had some relevance to his case—either to the question of whether he was guilty of the drug charge or to the sentence he might face if convicted. The 2019 revision, as the court opined at the hearing in April, has no impact on whether the defendant is guilty of possessing controlled substances with the intent to deliver them, or on what sentence he might receive if he is convicted on that charge. As the NIST itself indicated, the revision did not impact

13

measurement at the gram and kilogram levels. It impacts the universality of bases of measurement, as well as measurement at teeny, tiny micro levels. And the revisions went into effect in May 2019, almost eighteen months *before* the defendant's arrest. So by the time the DEA lab analyzed the substances in September of this year, it (and other labs around the world) had had access to the revised standards for twenty-eight months. The May 2019 revisions to the standards on which the metric system is based have nothing to do with whether the defendant possessed methamphetamine, heroin, crack and fentanyl on October 27, 2020—and that is what the jury will have to decide at his trial.

In his written motion to suppress, the defendant did not focus on the revision to the metric system, but on NIST traceability. The court has searched Westlaw, the electronic database of case law. It cannot find a criminal case in which a court granted a motion to suppress, or dismissed a case, because of the government's failure to prove "NIST traceability." The closest the court was able to come was a case called Ortiz v. New Jersey State Police, No. 16-7976, 2017 WL 3671307 (D.N.J. Aug. 25, 2017). The plaintiff had been arrested for driving while intoxicated; she later learned that the person responsible for calibrating the alcohol testing instruments, defendant Dennis, hadn't complied with proper procedures for over seven years. Id. at *1. Dennis was charged in a criminal complaint with failing to "use a NIST-traceable" digital thermometer as part of the calibration process and for submitting false certifications that he'd done so when he hadn't. Id. at *2. The

14

plaintiff sued the New Jersey State Police and others under 42 U.S.C. §1983, the civil rights statute, seeking damages for the fact that she was convicted and sentenced based, in part, on Dennis's conduct. The court dismissed the case for lack of jurisdiction, finding that the civil lawsuit sought to call into question the validity of the drunk driving conviction in violation of Heck v. Humphrey, 512 U.S. 477 (1984). Id. at *3-4.

It seems that the defendant may be arguing that he needs the lab reports, "field-test of drugs including certificate of analysis, scale instrument (device) certificate and scale instrument (device) certified report" (dkt. no. 47 at 1) so that he can determine whether the DEA lab used instruments that met NIST standards. As an aside, the court notes that any "field tests" of the drugs—quick, non-dispositive tests conducted by law enforcement on the scene of the arrest—have no bearing on this issue. It is the laboratory tests that serve as scientific proof that a substance is, in fact, a controlled substance, not a quick-and-dirty field test taken to determine whether there is probable cause to suspect that the defendant has committed a crime.

As for the lab reports, the court already has determined that the defendant is entitled to them and it appears that his defense counsel may have them but that they have not yet made their way to the defendant. But even if the lab reports show that the lab did not use devices that meet NIST standards, that would not necessarily provide the defendant with a defense to the charges. First, the defendant also has been charged with possessing a firearm after having been convicted of an offense that carries a penalty of

15

more than a year in prison. That charge has nothing to do with drugs or lab tests or measurements. Second, to serve as a defense to the charge in Count Two, the lab results would have to show that the devices used by the DEA lab inaccurately or incorrectly identified the substances found in the defendant's pockets as controlled substances. In other words, if the lab reports showed only that the DEA lab used a system that did not accurately *weigh* the drugs, that would not be a defense to the charge that the defendant possessed the drugs, or that he possessed them with the intent to distribute them.[7] Again, drug weight is not an element of the offense charged in Count Two.

The government points out that at trial, the defendant will have the opportunity to cross examine the two forensic analysists from the drug lab about how they tested and weighed the drugs. If the defendant is arguing that he needs time to review the lab reports and determine what kinds of questions he would want his lawyer to ask in that regard, he may talk with his lawyer about asking for an adjournment of the November 8, 2021 trial.

The defendant is correct that if the jury convicts him of the drug trafficking offense charged in Count Two, the *court* will have to determine the amount of drugs attributable to him when it is calculating his advisory sentencing range under the United States Sentencing Guidelines. If he is

---

[7] Drug weight is not the only evidence the government can present to show that someone possessed drugs with the intent to deliver them, rather than to use them. Packaging, the possession of cash or packaging materials or weighing equipment, the circumstances under which the defendant possessed the drugs (location, time of day or night) and other facts may demonstrate that a defendant possessed drugs for the purpose of distributing, not using, them.

convicted, the defendant's sentencing hearing likely would take place somewhere between three and four months after the trial. If the defendant believes that the lab reports show some error in the calculation of the weight of the various substances, he will have time to work with his counsel to present the court with argument in that regard. The court notes, however, that at sentencing, the government will need to prove the amount of the drugs only by a preponderance of the evidence, not beyond a reasonable doubt. United States v. Redmond, 667 F.3d 863, 875 (7th Cir. 2012) ("The government must prove the quantity of drugs for sentencing purpose by a preponderance of the evidence.")

Finally, the defendant asserts in his motion that "compliance with the regulations is the criterion for admissibility," and that if the government shows that it "substantially complied with the applicable regulations, the results are presumptively admissible." Dkt. No. 47 at 5. The defendant provides no source for these assertions. He has not identified any "regulations" with which the government must comply. He mentions "Burnside" in his brief, in the context of looking at the contents of a regulation to determine whether the government complied with it. Id. There is a Seventh Circuit case called United States v. Burnside, 588 F.3d 511 (7th Cir. 2009), but it has nothing to do with regulations or compliance; it is a case in which the defendant argued that the government lacked probable cause to arrest or search him and the district court improperly participated in his plea negotiations. A Westlaw search reveals that there are numerous federal cases whose captions include the name

17

"Burnside"—some criminal, some civil. The court does not have the resources to read every case with "Burnside" in the caption to determine whether any of them relate to regulations for analyzing or weighing drugs and a presumption of admissibility.

The defendant's due process argument fails because the government has turned over the lab reports to defense counsel. The defendant's arguments relating to proof of the amounts of drugs fail because weight is not an element of the offense charged in Count Two, so the government is not required to prove it nor is the jury required to find it. The defendant's arguments regarding NIST and ISU fail at this stage, because the revision to the metric system standards has no impact on the defendant's case and he has not, at this point, demonstrated (or indicated that he has reason to believe) that the DEA lab did not use instruments or procedures that were NIST-traceable. If the defendant's arguments boil down to the fact that he has not seen the lab reports and that he needs time to review them before trial, he may discuss with his defense attorney whether he wishes to seek an adjournment of the November 8, 2021 trial date.

The court **DENIES** the defendant's motion to suppress evidence. Dkt. No. 47.

Dated in Milwaukee, Wisconsin this 1st day of November, 2021.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER
Chief United States District Judge**
